## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **AHMAD A. KHAROFA, as personal representative of the Estate of Amer A. Kharofa, deceased** | ) ) ) ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Civil Action No. 5:15-cv-00088-CLS** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Ahmad A. Kharofa seeks damages for the tragic death of his son, Amer A. Kharofa. His claim is based upon the Federal Tort Claims Act of 1946, as amended, 28 U.S.C. §§ 1346(b), 2671-2680 ("FTCA").[1] He contends that his son's death was wrongfully caused by the combined and concurring negligence or recklessness of Mary Catherine Pearce and Jacob Wayne Battle, both of whom allegedly were acting within the line and scope of their employment as Sergeants in the Alabama Army National Guard. Specifically, plaintiff alleges that:

> 12. On or about June 4, 2011, upon a public road or highway, to-wit: Lightsey Road in Bibb County, Alabama, Mary Catherine Pearce, while acting within the line and scope of her employment with defendant, negligently and/or recklessly operated a motor vehicle by driving under the influence, driving over the posted speed limit, and thereby causing her to lose control of the vehicle while she was driving.

---

[1] *See* doc. no. 1 (Complaint), at 1-3.

As a result, the vehicle struck a tree with severe impact. Jacob W. Battle, the owner of the vehicle, negligently and/or recklessly entrusted his vehicle to Mary Catherine Pearce while acting within the line and scope of his employment with defendant. Amer A. Kharofa was a passenger in the vehicle.

13. As a direct and proximate result of Mary Catherine Pearce's negligence and/or recklessness and Jacob W. Battle's negligence and/or recklessness, Amer A. Kharofa perished.

Doc. no. 1 (Complaint), at ECF 3-4.[2] The case now is before the court on defendant's renewed motion to dismiss or, in the alternative, for summary judgment.[3] Following consideration of that motion, the parties' briefs, evidentiary submissions, and oral arguments of counsel, the court concludes that the motion should be granted.

## I. STANDARD OF REVIEW

Defendant's motion calls into question the extent to which the Federal Tort Claims Act waives the United States' sovereign immunity: an issue of subject matter jurisdiction. Binding precedent instructs that "where — as here — the existence of

---

[2] "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). *See The Bluebook: A Uniform System of Citation*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010). When this court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters ECF.

[3] *See* doc. no. 21. Defendant first filed a motion to dismiss or, in the alternative, for summary judgment on June 8, 2015. *See* doc. no. 4. That motion was denied without prejudice pursuant to Fed. R. Civ. P. 56(d), for additional discovery. *See* doc. no. 14. ***Nota bene***: This action was consolidated with a related case, *Timothy Rackley, as Administrator of the Estate of Logan Mackenzie Rackley, Deceased v. United States of America*, Civil Action No. 5:15-cv-107-CLS, from Aug. 13, 2015 through Dec. 2, 2016, the date upon which all claims asserted in the *Rackley* action were dismissed pursuant to a stipulation of counsel. *See* doc. no. 13 (Order Granting Motion to Consolidate); doc. no. 19 (Order Dismissing Civil Action No. 5:15-cv-107-CLS).

subject matter jurisdiction is inextricably intertwined with material facts affecting the merits of the claim, a district court must be guided by the standard for summary judgment motions under Fed. R. Civ. P. 56." *Bennett v. United States*, 102 F.3d 486, 488 n.1 (11th Cir. 1996) (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-30 (11th Cir. 1990); *Green v. Hill*, 954 F.2d 694, 697-98 (11th Cir.), *withdrawn and superseded in part on reh'g*, 968 F.2d 1098 (1992); *Eaton v. Dorchester Development, Inc*., 692 F.2d 727, 734 (11th Cir. 1982)).

Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is 'only a guess or a

possibility,' for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

On the date of the events giving rise to this action, plaintiff's son, Amer A. Kharofa ("Amer"), was a 22-year-old rising senior at the University of Alabama in Birmingham ("UAB"). He was enrolled in that school's Reserve Officers' Training Corps ("ROTC") as a "Cadet in training" to become a commissioned officer following graduation, and serving either on active duty in the United States Army, or

in a Reserve Component (*i.e.*, Army Reserve or Army National Guard).[4]

Toward the end of the first week of June 2011, Amer traveled to the National Guard Armory located at 185 Walnut Street in Centreville (Bibb County), Alabama, for the purpose of participating in a three-day "drill weekend."[5] The military exercises began during the early-morning hours of Friday, June 3, and were scheduled to conclude during the evening hours of the following Sunday, June 5, 2011.[6] The Alabama Army National Guard provided lodging for all soldiers who resided more than 50 miles from the drill site at the "Windwood Inn": a privately-owned hotel located at 2923 Main Street in Brent (Bibb County), Alabama,[7] about three-tenths (0.3) of a mile from the Centreville National Guard Armory. Sergeant Mary

---

[4] *See generally*, *e.g.*, https://en.wikipedia.org/wiki/Reserve_Officers%27_Training_Corps (last visited Aug. 1, 2017).

[5] *See*, *e.g.*, http://todaysmilitary.com/videos/drill-weekend ("It's during Drill Weekend that reservists pause their civilian life and resume their military career. Drill weekends can include physical training, advanced training, and work, for their military job or Military Occupational Specialty (MOS).") (last visited Aug. 2, 2017).

[6] *See* doc. no. 1 (Complaint), at ¶¶ 7-12. Plaintiff's complaint, of course, is not evidence. Even so, both plaintiff and defendant included these proposed facts in their briefs, and the facts are not disputed. *See* doc. no. 21-1 (Defendant's Brief), at 3 (Proposed Fact No. 2); doc. no. 23 (Plaintiff's Brief), at 3 (Plaintiff's Additional Undisputed Fact No. 1). Therefore, these facts will be taken as true for summary judgment purposes. *See* doc. no. 15 (Uniform Initial Order), at ECF 15 ("*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*") (emphasis supplied); *id*. at ECF 16 ("*All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.*").

[7] *See* doc. no. 21-2 (Declaration of Major Jason Wells), at ¶ 4; doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 21-23.

Catherine Pearce and Amer were among the soldiers who received that benefit for the drill weekend.[8]

The soldiers were dismissed from drill at 4:30 p.m. (1630 hours) on the initial day of drill.[9]  After that time, "Soldiers were free to make their own dinner plans wherever they chose."[10]  Seven of them — *i.e.*, *Mary Catherine Pearce* (an E-5 Sergeant), *Jacob Wayne Battle* (another E-5 Sergeant who outranked Sergeant Pearce), *Logan MacKenzie Rackley* (an E-4 Specialist), *Stephen Trey Selman* (another E-4), *Christopher Cody Hamner* (the third E-4), *Amanda Marie Saunders* (the fourth E-4), and *Amer* ("ROTC Cadet in training") — drove from the Centreville Armory to the Windwood Inn in Brent and changed clothes.[11]  Some of those soldiers, but particularly Sergeants Pearce and Battle, began to consume alcoholic drinks purchased with personal funds.  Amer did not join in.[12]

After drinking for several hours, the soldiers named above climbed into Sergeant Battle's pick-up truck, apparently with the intention of driving to a shooting

---

[8] *See* doc. no. 23-3 (Deposition of Mary Catherine Pearce), at 54-55.

[9] *See* doc. no. 21-2 (Declaration of Major Jason Wells), at ¶ 2 ("Soldiers were released at 1630 (4:30 pm) on Friday, June 3, and Saturday, June 4."); doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 21 (describing drill dismissal as "[b]etween 4:00 and 5:00 . . .") (alteration supplied).

[10] Doc. no. 21-2 (Declaration of Major Jason Wells), at ¶ 3.

[11] *See* doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 22-23; doc. no. 23-3 (Deposition of Mary Catherine Pearce), at 57.

[12] *See* doc. no. 21-3 (Affidavit of Amanda Saunders), at 1; doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 23-26; doc. no. 23-3 (Deposition of Mary Catherine Pearce), at 57-60.

range located on Lightsey Road:[13] an unpaved stretch of road in Bibb County, on the edge of the Talladega National Forest,[14] approximately 7.8 miles from the Windwood Inn in Brent. Amer was designated to drive because he had not been drinking.[15] Sergeant Battle sat in the passenger seat, and Sergeant Pearce occupied the space on the truck seat between Amer and Battle. The remaining soldiers piled into the truck bed.[16] The group then drove into the rural area near the Talladega National Forrest.

Amer was not familiar with the rural roads of Bibb County, but Sergeant Pearce was, as a result of having lived nearby at some time in the past. Consequently, she provided verbal directions.[17] Even so, Amer still managed to become lost on the unpaved roads in the forested area, and stopped the truck at some unspecified place. When he did, some of the soldiers climbed out of the truck to relieve themselves in the woods.[18] When they returned, Sergeant Battle determined that they should turn

---

[13] As plaintiff notes: "The purpose of the ride is unclear from the record; however[,] some accounts state the group of soldiers were going to a nearby firing range." Doc. no. 23 (Plaintiff's Brief), ¶ 8, at 6 (alteration supplied).

[14] *See* doc. no. 23-3 (Deposition of Mary Catherine Pearce), at 62. See also the citations contained in doc. no. 21-1 (Defendant's Brief), at 4 & ¶ 5.

[15] *See supra* note 12.

[16] *See* doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 35-36; doc. no. 23-4 (May 5, 2012 Sworn Statement of Jacob Wayne Battle), at ECF 2.

[17] *See* doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 30-31.

[18] *Id.* at 31; doc. no. 23-5 (Memorandum Report of Investigating Officer Major Hearn), at ¶ 3; doc. no. 23-6 (Sworn Statement of Jacob Wayne Battle), at ECF 2.

around and return to the hotel, to "[p]lay it safe."[19]  Exactly what occurred next is disputed.

In a handwritten statement given on June 4, 2011, the day after the events leading to this action, Sergeant Battle said that, when the soldiers returned to the truck after relieving themselves, "we decided to turn around and head back.  At that time Sgt Peirce [*sic*] insisted on driving *and had pushed Cdt Karafa* [*sic*] *out of the truck*.  So I unbuckled my seatbelt and moved to the middle of the truck.  Cdt Karafa [*sic*] got in the passenger seat. . . ."[20]  The statement written by Specialist Stephen Trey Selman on the same date was consistent with Battle's:  *i.e.*, "*Sgt. Pearce then slid him* [Amer] *out of the driver's seat* and he walked around to the other door to get in."[21]

Sergeant Battle's second sworn statement, however, delivered on May 9th of the following year, provided a slightly different account.  He said that, when the truck stopped in the woods, Sergeant Pearce unbuckled Amer's seat belt, opened the truck

[19] Doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 31 (alteration supplied).  The commanding officer of the Centreville National Guard Armory was aware that soldiers often consumed alcoholic drinks or beverages at the end of drill, but he only issued reprimands when drunkenness impaired a soldier's ability to participate in the following day's military activities.  Sergeant Battle testified that soldiers normally avoided reprimands by knowing "when to cut it off," and how to "regulate" the amount of alcohol consumed.  *Id*. at 24.

[20] Doc. no. 21-5 (June 4, 2011 Sworn Statement of Jacob Wayne Battle), at ECF 2 (alterations and emphasis supplied).

[21] Doc. no. 21-6 (June 4, 2011 Sworn Statement of Stephen Trey Selman), at ECF 2 (alteration and emphasis supplied).

door, and directed Amer to "get out," because she knew how to drive them back to the hotel.[22]

Battle provided yet another version of events during his July 7, 2016 deposition, when testifying that Amer was one of the individuals who exited the truck to relieve himself. When Amer returned to the truck cab, Sergeant Pearce already had moved into the driver's seat behind the steering wheel.[23]

Battle acknowledged during his deposition that it was not wise to allow Pearce to drive his truck, because he knew that she had been drinking, but he told himself that "we'll let her drive for a few minutes and then get her out."[24] Amer urged Sergeant Battle to allow him to continue driving, but when Battle responded "I don't know," Amer walked around the truck and sat in the passenger seat.[25]

In any event, and despite the fact that Mary Catherine Pearce was "very intoxicated," it is undisputed that she assumed control of the truck.[26] Battle described what happened next in the statement delivered the following day:

As we traveled back down the dirt road Sgt Peirce [*sic*] started gaining too much speed and we tried to get her to slow down. At that time we started around a curve when we ran off the road and started down

---

[22] *See* doc. no. 23-4 (May 5, 2012 Sworn Statement of Jacob Wayne Battle), at ECF 2.

[23] *See* doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 32-33.

[24] *Id*. at 32.

[25] *Id*.

[26] *See* doc. no. 23-3 (Deposition of Mary Catherine Pearce), at 59.

through the woods. As we side swipped [*sic*] one tree Cdt Karafa [*sic*] fell over into my lap and we continued down through the woods untill [*sic*] we struck another tree coming to a stop. Sgt Peirce [*sic*] climbed over myself and Cdt Karafa [*sic*] to get out of the vehicle and start checking on everybody. Sgt Peirce [*sic*] and Spc Saunders made it to the top of the hill. Spc Selman dialed 911. I was unable to get out of the truck until Fire and Rescue showed up. After I was assisted out of the truck and helped to the top of the hill to get checked out by EMS.

Doc. no. 21-5 (June 4, 2011 Sworn Statement of Jacob Wayne Battle), at ECF 2-3.

Amer was killed instantly.[27] Specialist Logan Rackley, who had been riding in the truck bed, also died as a result of his injuries.[28]

The Alabama Army National Guard conducted an investigation to determine whether Amer had died in the "Line of Duty" and, thus, whether his family was entitled to receive financial benefits from the United States.[29] The initial investigatory report concluded that Sergeant Pearce "instructed Cadet Kharofa to pull over and let her drive" because Amer had become lost and she was familiar with the area.[30] The investigator also concluded that Amer had not engaged in any misconduct, and that he was acting within the line of duty when he died.[31]

Major Gonzalo Pinacho, a Judge Advocate General (JAG) officer, reviewed the

---

[27] *See* doc. no. 23 (Plaintiff's Brief), at ECF 11, Plaintiff's Additional Undisputed Fact No. 14 ("Defendant has stipulated that the vehicular collision was the cause of Cadet Kharofa's death.").

[28] *See* doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 36-37.

[29] *See* doc. no. 23-9 (Deposition of Major Gonzalo Pinacho), at 17.

[30] *See* doc. no. 23-5 (July 6, 2012 Line of Duty Determination), at ECF 1.

[31] *Id.* at ECF 2-3.

initial line of duty determination on October 2, 2012, and concluded that Amer had not engaged in any kind of misconduct that would prevent a line of duty determination. His report stated:

> Far from committing misconduct, *SGT* [*sic*] *Kharofa* sought to prevent harm to his fellow soldiers by taking the initiative to drive as the only person that had not had any alcohol on the night of his death. But SGT Pearce frustrated this when she demanded to drive, and then took over as driver. When that happened, *SGT* [*sic*] *Kharofa* no longer had control over the vehicle. Any claim that he should have prevented SGT Pearce from taking the wheel assumes several things[:] (1) that the circumstances were such that *SGT* [*sic*] *Kharofa* had a duty to prevent SGT Pearce from committing the crime of drunk driving; (2) that he knew that SGT Pearce was in fact intoxicated beyond the legal limit; (3) that he had the ability, power or opportunity to prevent SGT Pearce from driving; and (4) that it was foreseeable that SGT Pearce would speed along a dirt country road at night with a pick-up truck bed filled with passengers. There is nothing in the record that would support an affirmative answer to any of these questions, and doing so would be rank speculation.

Doc. no. 23-10 (October 2, 2012 Memorandum Re: Legal Review of Line of Duty Investigation), ¶ 10 (alterations and emphasis supplied to reviewer's incorrect recitation of Cadet Amer Kharofa's rank, footnote omitted).

Another legal review of the initial line of duty investigation was conducted on October 4, 2012.[32] The reviewing officer noted that, even though Mary Catherine Pearce's drunk driving and resultant loss of control over the vehicle were the primary

---

[32] The relationship between the October 2 and October 4 reviews and reports cannot be determined from the record.

causes of Amer's death, Amer's conduct must be examined

> to determine if his actions may be considered either as a secondary proximate cause attaching willful negligence which would not be in the line of duty due to [his] own misconduct /not due to [his] own misconduct; or if Cadet Kharofa[']s actions are simple negligence which is insufficient/inconsistent for a determination of not in line of duty.

Doc. no. 23-8 (October 4, 2012 Memorandum to the Chief Counsel, National Guard Bureau), at ECF 1 (alterations supplied). The reviewer considered evidence that Amer's

> seatbelt was unfastened and he was told to get out of the seat by a superior ranking SGT Mary Pierce [*sic*] who took over driving. The actions by SGT Pierce negate any implication of intentional, or deliberate disregard for foreseeable consequences that may be presumed because Cadet Kharofa relinquished control to SGT Pierce. Further, without contravening evidence that Cadet Kharofa relinquished control of the vehicle to SGT Pierce with deliberate disregard of the consequences we must determine that his actions rise to the level [of] simple negligence.

*Id.* (alteration supplied). Additionally:

> The direct evidence reflects that Cadet Kharofa's conduct is simple negligence in that, [*sic*] he volunteered to drive because he had not been drinking which shows a regard for consequences and degree of care. Under the surrounding circumstances he is a Cadet, twenty-two years of age, very little military training and it is more probable that he relinquished control of the vehicle out of duress that a senior NCO [*Non-Commissioned Officer*] exerted rank over him, all but physically forcing him out of the vehicle by unfastening his seatbelt and opening his door. Additionally, soldiers of his age, maturity of judgment and training would likely react similarly to a more senior NCO under similar circumstances fearing punishment, being left and/or without recourse.

*Id.* at ECF 1-2 (alteration supplied).  The reviewer concluded:

> The proximate cause of the accident remains the responsibility of SGT Pierce, and subject to the analysis above Cadet Kharofa's relinquishment of control of the vehicle is simple negligence and there is no evidence of willful misconduct on his part.  Similarly, there is no evidence of intentional or willful disregard for the consequences.  The statements provided show that he fully intended to be the designated driver but was forced to move at the direction of SGT Pierce who is superior in rank, and age.  A reasonable person of similar age[,] rank[,] and experience would likely make a similar err[or] in judgment succombing [*sic*] to the pressure of a superior[']s direction.  It is far reaching to assume that Cadet Kharofa intended or recklessly disregarded the dangers of someone driving under the influence when he was flanked by more superior NCO's and there is no evidence that SGT Battle attempted to support him in opposing SGT Pierce taking over driving.

*Id.* at ECF 2 (alterations supplied).[33]

## III. DISCUSSION

Plaintiff claims that his son's death was proximately caused by Sergeant Jacob Wayne Battle's negligent and/or reckless entrustment of his pick-up truck to the control of Sergeant Mary Catherine Pearce while she was intoxicated, and by Sergeant Pearce's subsequent negligent and/or reckless operation of the truck.[34]

The Federal Tort Claims Act waives the sovereign immunity of the United States and permits the recovery of money damages for "personal injury or death

---

[33] There is no explanation in the record why this reviewing officer believed Sergeants Jacob Wayne Battle and Mary Catherine Pearce to be Amer's superior officers, when the Army Regulations cited by the government's attorney clearly indicates that they were not.

[34] *See* doc. no. 1 (Complaint), at ¶¶ 12-13.

13

caused by the negligent or wrongful act or omission of any employee of the Government" while acting within the line and scope of the employee's office or employment, and "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also*, *e.g.*, *Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 475-76 (1994) (citing § 1346(b), and observing that the Act "waived the sovereign immunity of the United States for certain torts committed by federal employees").

Another provision of the Act defines the statutory reference to "any employee of the Government" as including "members of the National Guard *while engaged in training or duty*." 28 U.S.C. § 2671 (emphasis supplied). The same statute defines the phrase "acting within the scope of his office or employment" as meaning, in the context of a member of the National Guard, "acting *in line of duty*." *Id*. (emphasis supplied).[35]

---

[35] The full text of § 2671 reads as follows:

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, *the military departments*, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

"Employee of the government" includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, *members of the National Guard while engaged in training or duty under section* 115,

Sergeant Battle testified that he and the other soldiers were placed on active duty status for the June 3-5, 2011 weekend, and that they remained on duty even when they were not physically present at the National Guard Armory.[36] That testimony was not disputed. Thus, it seems apparent that Sergeants Pearce and Battle were "engaged in training or duty" at the time of the accident, and that they were federal employees for purposes of the FTCA. The remaining question is whether their actions and inactions leading to the accident were taken within the line and scope of their employment with the Guard.

"The question of whether an employee's conduct was within the scope of his employment 'is governed by the law of the state where the incident occurred.'" *Flohr v. Mackovjak*, 84 F.3d 386, 390 (11th Cir. 1996) (quoting *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1542 (11th Cir. 1990)). Here, the accident occurred in Alabama and, thus, the law of that State applies.

---

316, 502, 503, 504, or 505 *of title 32*, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

"*Acting within the scope of his office or employment*," in the case of a member of the military or naval forces of the United States *or a member of the National Guard* as defined in section 101(3) of title 32, *means acting in line of duty*.

28 U.S.C. § 2671 (emphasis supplied).

[36] *See* doc. no. 23-1 (Deposition of Jacob Wayne Battle), at 41-44 (alteration supplied).

The Alabama Supreme Court has repeatedly held that:

> The rule which has been approved for determining whether certain conduct of an employee is within the line and scope of his employment is substantially that if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment.

*Nelson v. Johnson*, 88 So. 2d 358, 361 (Ala. 1956) (citing *Railway Express Agency v. Burns*, 225 Ala. 557, 52 So. 2d 177 (1950), and *Rochester-Hall Drug Co. v. Bowden*, 218 Ala. 242, 118 So. 674 (1928)); *see also, e.g.*, *Doe v. Swift*, 570 So. 2d 1209, 1211 (Ala. 1990) (same); *Solmica of Gulf Coast, Inc. v. Braggs*, 232 So. 2d 638, 642 (Ala. 1970) (same). "Such conduct, to come within the rule, must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in promotion of the business of his employment." *Rochester-Hall Drug Co.*, 118 So. at 674 (citation omitted); *see also Solmica*, 232 So. 2d at 642 (same). Moreover, "the dispositive question is whether the employee was engaged in an act that he was hired to perform or in conduct that conferred a benefit on his employer." *Hulbert v. State Farm Mutual Automobile Insurance Co.*, 723 So. 2d 22, 24 (Ala. 1998) (internal citations omitted).

Sergeants Pearce and Battle were not employed to drink alcohol or to go on joy rides. Their consumption of alcohol during the night after the first day of drill duty

did not further their employment with the Alabama National Guard, or confer a benefit on the Guard. If anything, their consumption of alcohol likely would have had the opposite effect, by impairing their performance during the following day's drill duty. They also did not purchase their alcoholic drinks with government funds, and they changed out of their Guard uniforms and left the Armory property before beginning to consume alcoholic beverages or liquor. The same principles apply to Sergeant Pearce's decision to drive Sergeant Battle's truck while intoxicated, and to Sergeant Battle's decision to allow her to do so. Those were wholly personal actions that had nothing to do with their official duties as members of the Alabama National Guard. *Cf. Acadia Insurance Co. v. United States*, 674 F. App'x 938, 940 (11th Cir. 2017) (holding that an FBI agent who may have started a fire while smoking cigarettes on the balcony of the hotel in which he was staying while out of town for a training course would not have been acting within the line and scope of his employment because the agent was off-duty and unsupervised for the evening, and the FBI prohibited the purchase of cigarettes with a government credit card).

Plaintiff asserts that Sergeant Pearce was acting within the line and scope of her employment when she took over the wheel of the truck, because she was attempting to confer upon her employer, the Alabama Army National Guard, the benefit of returning the group of soldiers to their hotel in order to report on time for

the following day's drill duties. Plaintiff extends the same argument to Sergeant Battle, who, he asserts, was assisting in Sergeant Pearce's efforts by allowing her to drive his truck despite her intoxication. Plaintiff relies upon the Alabama Supreme Court's decision in *Solmica of Gulf Coast, Inc. v. Braggs*, 232 So. 2d 638 (Ala. 1970). There, an employee of Solmica caused an accident in his personal vehicle after normal work hours and after consuming alcohol. *Id.* at 640-62. The employee told investigating officers that, at the time of the accident, he was "probably" returning to Solmica's office to collect additional construction supplies that were needed for the following day's work, but which had not been available earlier in the day. *Id.* at 641. The evidence also showed that it was customary for employees to collect supplies during the afternoon or night hours before a job, because they might have to arrive at a job site too early in the morning to retrieve the supplies before normal work hours. *Id.* at 643. The court held that there was sufficient evidence to go to the jury on the issue of whether the employee was acting within the line and scope of his employment at the time of the accident, because

> one of [the employee's] duties was to take Solmica's material to the job he was working on and Solmica permitted him to pick the materials up after regular office hours, and it was in the furtherance of his employment and a benefit both to him and to Solmica to get the materials on the job.

*Id.* at 643 (alteration supplied).

18

According to plaintiff, just as the employee in *Braggs* conferred a benefit on his employer by obtaining, after regular office hours, the construction materials that were necessary for the next day's work, Sergeants Pearce and Battle conferred a benefit on the Army National Guard by attempting to ensure that the group of soldiers was returned to their hotel in time to report for the following day's drill.

Plaintiff's interpretation stretches the *Braggs* holding too far. Here, it was not the regular duty of either Sergeant Pearce or Battle to transport other Guardsmen to the Armory for drill, or to ensure that any other Guardsmen were present for drill. There is no indication that any of the other Guardsmen regularly relied upon Sergeants Pearce or Battle for transportation. There also is no indication that it was customary, or encouraged by the Guard, for officers to take late-night joyrides on unfamiliar roads during drill weekends, thus necessitating someone with superior knowledge of the roadways to ensure their safe return to their hotel. To the extent that the other Guardsmen were forced to rely upon Jacob Wayne Battle's truck and Mary Catherine Pearce's driving to return to their hotel before reporting for drill duty the following day, it was only because they had placed themselves, for wholly personal reasons, in the position of needing a ride. Thus, this case is not like *Braggs*, where neither the driver nor any of the other employees in his crew could have fulfilled the obligations of their employment unless the driver returned to the office

to obtain construction materials needed at the beginning of the next day's work.

Plaintiff also argues that, because Sergeants Pearce and Battle were older and had more years of military experience than Amer, they took a "leadership role" during those events that led to Sergeant Pearce's assumption of control over the truck.[37] That argument has no effect upon the "line and scope of employment" analysis. Plaintiff acknowledges that, because Amer was a Cadet in training to become an officer upon completion of his ROTC program and graduation from UAB, and Sergeants Pearce and Battle were non-commissioned officers, "neither Pearce nor Battle could 'order' [Amer] to do anything in the military sense of the word."[38] The fact that Mary Catherine Pearce and Jacob Wayne Battle may have assumed, or may have been presumed to have, some sort of leadership role within the social group of seven Guardsmen who were riding in Battle's truck after drill hours on the night of the accident has no bearing on the issue of whether the United States should be held liable for the negligence or recklessness of Sergeants Pearce and Battle.

Finally, plaintiff argues that the results of the National Guard's "line of duty" investigation are "strongly suggestive" of a finding that *Battle* was acting within the line and scope of his employment when he entrusted his vehicle to Mary Catherine

---

[37] *See* doc. no. 23 (Plaintiff's Brief), at ECF 20.

[38] *Id*. (alteration supplied).

Pearce on the evening of the accident.[39]   That argument fails for several reasons.

First, the purpose of the Guard's line of duty investigation was to determine whether

*Amer* was acting within the line of duty when he died, such that his family would be

eligible for financial benefits from the United States.   The investigation had nothing

to do with whether *Battle* was acting in the line of duty.   Even if it had, the line of

duty determination was conducted pursuant to Army Regulation 600-8-4, at ¶ 2-2e(5),

which provides for benefits to National Guard members who are injured "while

remaining overnight immediately before the commencement of inactive duty training,

or while remaining overnight, between successive periods of inactive duty training,

at or in the vicinity of the site of the inactive training."   That regulation is not based

upon the same policies, and does not require the same type of analysis, as the

Alabama common law cases governing line and scope of employment.   A "line of

duty" determination might be more persuasive in determining whether the tortfeasor

was an employee of the government at the time of the tort, but it simply does not

inform the question of whether an employee was acting within the line and scope of

his employment.   In fact, the regulation governing line of duty determinations

---

[39] Plaintiff does not even attempt to make the same argument with regard to Mary Catherine Pearce, instead acknowledging that, as a result of her own misconduct, Pearce would have been found to be *not* acting within the line of duty.   *See* doc. no. 23 (Plaintiff's Brief), at 18 n.2 ("The Army regulations applied to Sergeant Pearce at the time would have resulted in a finding of 'not in the line of duty, due to own misconduct.'").

explicitly states that it "has no bearing on the meaning or application of the phrase 'acting within the scope of his office or employment' as used in the context of [the FTCA]." Army Regulation 600-8-4, at i (alteration supplied).[40]

## IV. CONCLUSION AND ORDER

This was a tragic death. The life of a bright and promising young man was cut short as a result of irresponsible decisions by two older soldiers. Based upon their greater experience, one would have expected more mature behavior. Even so, this court finds that neither Jacob Wayne Battle nor Mary Catherine Pearce was acting within the line and scope of his or her employment as Sergeants with the Alabama Army National Guard at the time and place of the events that caused the death of plaintiff's son, Amer Kharofa. Accordingly, there is no basis for holding the United States liable for the negligence or recklessness of Sergeants Pearce and Battle under the Federal Tort Claims Act. Defendant's motion for summary judgment is GRANTED, and all claims of plaintiff are DISMISSED with prejudice. Costs are taxed as paid. The Clerk is directed to close this file.

---

[40] Because this court has determined that the line of duty determination has little to no bearing on the issue of whether Mary Catherine Pearce and Jacob Wayne Battle were acting within the line and scope of their employment with the National Guard at the time of the accident, there is no need to consider defendant's argument that, if any of the pertinent Guardsmen were acting within the line of duty, plaintiff's claims might be barred by the Supreme Court's decision in *Feres v. United States*, 340 U.S. 135 (1950), which held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.* at 146.

DONE this 8th day of August, 2017.

_____
United States District Judge